30 C.C.P.A.(Patents)

·PATTERSON et al. v. CLEMENTS et al.

Patent Appeal No. 4768.

Court of Customs and Patent Appeals.

July 6, 1943.

Pennie, Davis, Marvin & Edmonds, of New York City (Clarence M. Fisher, of Washington, D.C., and Merton W. Sage and James B. Christie, both of New York City, of counsel), for appellants.

John G. Sbarboro, of Washington, D.C. and Stanley E. Ross, of Detroit, Mich., for appellees.

Before GARRETT, Presiding Judge, and BLAND, HATFIELD, LENROOT, and JACKSON, Associate Judges.

BLAND, Associate Judge.

The invention defined in the two counts of this interference is briefly described in the decision of the Board of Interference Examiners as follows: "This interference relates to powder metallurgy and is particularly concerned with the production of steel powders for use in the manufacture of steel objects by compressing and sintering the powder. One of the essential characteristics of a satisfactory powder for this use is that the powder be compressible into a strongly coherent mass of the desired shape. Powders which have the required carbon content, however, are apt to be so hard that they cannot be compacted properly. The principal object of the present invention appears to be to concentrate the carbon in the center or core of the individual particles and leave the outer portions of the particles substantially free from carbon and, therefore, soft enough to cohere with other particles when compressed."

The counts read:

"1. Steel powders comprising steel particles having iron substantially throughout and having a substantial proportion of carbon combined with the iron and concentrated in the cores of the particles, said particles having exterior ferritic zones substantially free from carbon.

"2. A process for making steel powders which comprises subjecting hot iron powder particles to the action of a carburizing gas until carbon has been deposited on the interior of the particles in the form of a substance selected from the group consisting of pearlite and cementite, and thereafter subjecting said powder to the action of a gaseous decarburizing agent until the outer portions of the particles are substantially decarburized but combined carbon remains in the interior of the particles."

The interference involves two patents: A patent to Patterson and Goetzel, No. 2,175,850, granted October 10, 1939, on an application filed March 17, 1939,

and patent No. 2,164,198 to Clements, Terry, and Henry, granted June 27, 1939, on an application filed May 5, 1938. The counts originated in the Patterson et al. patent and were copied by appellees into an application, filed June 14, 1940, for reissue of appellees' patent. The interference, therefore, is between appellants' patent and appellees' reissue application. The applications for the two patents were co-pending, and Patterson et al. must therefore prove their priority by a preponderance of the evidence in order to prevail.

Clements et al. took no testimony but relied upon their filing date, May 5, 1938, for conception and constructive reduction to practice of the invention defined by the counts. Patterson et al. took the testimony of three witnesses.

Patterson et al., in the Patent Office, raised the question of the right of Clements et al. to make the counts and also urged the sufficiency of their (Patterson et al.'s) proofs to overcome the record date of Clements et al. The first question was raised before the Primary Examiner by motion to dissolve. The examiner ruled against appellants, holding that Clements et al. could make the counts.

The case was then set for final hearing before the Board of Interference Examiners, and the board, in its original decision, stated: " * * * Patterson et al. are not now questioning the right of Clements et al. to rely on the date of May 5, 1938, and the only question to be decided is whether or not the proofs submitted by Patterson et al. are sufficient to overcome that date." The board proceeded to hold that Patterson et al.'s proofs were insufficient and awarded priority to Clements et al.

Patterson et al. requested a reconsideration, and the board acknowledged its oversight in failing to pass upon the question of the right of Clements et al. to make the counts. In its second decision, the board affirmed the position of the Primary Examiner in holding that the application of Clements et al. supports the counts.

Patterson et al. have appealed here alleging error in both of said holdings of the board and in its award of priority to appellees.

It will be noticed that count 1 is directed to a steel powder, while count 2 is directed to a process for making steel powder and calls for subjecting hot iron powder to the action of a *carburizing gas* until carbon has been deposited on the interior of the particles "in the form of a substance selected from the group consisting of pearlite and cementite" and thereafter subjecting the powder to the action of a *gaseous decarburizing agent* until the outer portions of the particles are substantially decarburized, leaving combined carbon in the interior of the particles.

Speaking broadly, it was contended by Patterson et al. below, and here, that the process set out in the Clements et al. application involved the making of powder from scrap steel (such as machine shop chips and turnings), without any knowledge of the exact quantity of carbon therein contained, and that because of the lack of detailed disclosure in the Clements et al.'s application (the disclosure being in rather general terms) there is no teaching in said application that appellees' process, if followed, would necessarily produce a substance such as is defined by count 1.

It was the holding of the board on this issue that one following the process of Clements et al. would inherently produce the powder defined by count 1 and having the interior and exterior qualities specified by count 2. Patterson et al. also urge here that if the board's construction of the counts, in holding that Clements et al. have the right to make them, is adhered to by this court, their (Patterson et al.'s) early work as shown by the record, antedating Clements et al.'s record date, meets every requirement of the counts, and that therefore they have proved their priority and are entitled to an award of priority.

We shall proceed to discuss and decide the first issue—the right of Clements et al. to make the counts.

In holding that the process followed by Clements et al. is the process of count 2 and that carrying out such process would inherently produce the product of count 1, the Primary Examiner and the board have pointed out that count 1 calls for the concentration of carbon in the cores of the particles and for "ferritic zones substantially free from carbon" on the exterior of the particles, and that count 2 requires that the same result be obtained and the decarburizing step carried out "until the outer portions of the particles are substantially decarburized but combined carbon remains in the interior of the particles".

Clements et al., in their patent specification, have the following to say: "The resulting powder is satisfactory for many uses but where it is desired to form articles out of the material by pressing, it is preferred to give the material further treatment to increase the cohesiveness of the particles. This may be done by annealing it in a suitable oven having a non-oxidizing or reducing atmosphere to soften it without decreasing the carbon content or it can be annealed in moist hydrogen to decrease the carbon content to the extent desired and at the same time reduce any oxides formed during quenching. * * *"

In addition to this the specification points out that a hydrogen atmosphere had proved satisfactory for the annealing step and that: " * * * The reducing atmosphere removes any oxides that may be present and, depending upon its composition, *also reduces the carbon content to the amount desired.* The annealing operation leaves the material soft so that it may be readily deformed and dry pressing may be successfully used to make articles from the powder." [Italics ours.]

It is further stated in the specification that satisfactory powder had been made from machine shop chips and turnings not exceeding about .035 inches in thickness, that this material was carburized in natural gas until the carbon content was about .8 per cent or more at the center of each piece, and that it was then ground to the desired degree of fineness and finally annealed from half an hour to one hour at 1500° to 1700° F. in an atmosphere of hydrogen in a revolving pot.

It will be noted that the temperatures and time of treatment compare favorably with those of Patterson et al. (who decarburize in hydrogen at 900° C., or about 1650° F., from half an hour to two hours in a rotating muffle) and that the process involves the same decarburizing gas. Clements et al. state in their specification: "An advantage of this method of making iron powder is the fact that any desired degree of hardness or carbon content may be obtained by controlling the steps of the process. * * *"

At this point it is called to our attention that in the prior art there had been attempts to make metallic powders suitable for compressing purposes by adding to the iron powders, carbon in the form of lampblack. This was found to be unsatisfactory since the lampblack carbon did not diffuse sufficiently into the metal powders treated but left free carbon therein. Both parties hereto use gas containing carbon for the purpose of carburizing the material. This is said to leave no free carbon in the product but to produce a powder containing diffused carbon or "combined" carbon, as is called for by the counts.

Nothing in the Clements et al. specification discloses the amount of carbon content of the material or how it is distributed in the particles, nor is it suggested that treatment would leave the outer portion soft and the inner portion harder than the outer portion. Nevertheless, if the process taught by Clements et al. is followed, it seems to us that a product like that involved here would inherently be produced. There is nothing in count 2 stating how long or at what temperatures the carburizing or decarburizing operations are continued, except in the term which states in effect that the particles will be hard in the middle and soft on the outside. (It is pointed out by Clements et al. in their brief that count 1 does not require that *all* the exterior portions of the particles be ferritic and substantially free from carbon.)

We think there is no answer to the reasoning of the board that if the starting material contains carbon or if it is carburized and subsequently decarburized to any substantial degree, a product with softened surfaces and hardened cores will inherently result. The resultant product, according to the teaching of both parties, makes a desirable powder for compressing purposes.

The tribunals below have referred to certain authorities on metallurgy as supporting their conclusion on the question of inherency. Among those cited are Steel and Its Heat Treatment, by Bullens, 1938 edition, page 265; Metals, by Carpenter and Robertson, 1939, pages 743-751; and The Journal of the Iron and Steel Institute, No. 1 (1922) Vol. 105, pages 93 to 140.

Appellants have argued that the Clements et al. disclosure does not show that the carbon may not be in a free state rather than in a combined state. The examiner points out that "it is considered that carburizing at 1700° F. for from 1 to 3 hours * * * will produce carbon in the combined state." He relies upon some of the authorities above referred to in support of this conclusion. That these

authorities support such a conclusion is not questioned by appellants in this court, and therefore we do not feel justified in extending this opinion by quoting therefrom.

Appellants, in their brief here, make the following statement: "It is true that Clements et al also disclose that the annealing treatment can be so conducted as to remove carbon 'to the desired extent' but at no point do they state what the desired extent is."

Appellants also make the following admission and contention:

" * * * And so, while the possibility that one following the disclosure of Clements et al might practice the process of count 2 or make the product of count 1 is not excluded, it is plain that there are a number of other possibilities, all of which satisfy the disclosure of Clements et al but none of which satisfies the counts. Among these are:

"1. An operation in which no decarburization occurs, and in which the carburized material is treated 'to soften it without decreasing its carbon content' * * *;

"2. An operation in which decarburization proceeds throughout the steel particles at an approximately uniform rate, so that there is never any difference between the inside and outside of the particles and no shell of carbon-free iron is produced on the outside of the particles * * *;

"3. An operation in which the particles are decarburized substantially completely, both inside and out, to produce a homogeneous carbon-free product * * *; and

"4. An operation in which the inside of the particles contain combined carbon, but in a form other than those required by the counts * * *."

As to the first possibility, it is admitted by appellants that the annealing process of Clements et al., performed in a hydrogen atmosphere, removes carbon, and that Clements et al. teach that carbon could be removed to the desired extent. Clements et al. anneal with the use of hydrogen. How can it be urged that if there was annealing in the same kind of atmosphere as that used by Patterson et al., there was no resulting decarburization?

In answer to appellants' contention in relation to the second possibility that the decarburization proceeds throughout the particles at a uniform rate and that the particles do not have a soft outside shell and a hard portion on the inside, it seems clear that if the process of appellants produced the desired result, that of appellees would also produce it.

The third possibility appellants state is that the Clements et al. operation might consist of decarburizing the particles substantially completely both inside and out, thereby leaving "a homogeneous carbon-free product." It is sufficient answer to say that, as pointed out by the board, "it would appear illogical to carefully carburize the material and then completely decarburize it." And the mere fact that it was necessary to carburize the material in order to make it brittle for crushing does not change the situation, since it is not apparent from the Clements et al. disclosure that a final, completely decarburized product was desirable. On the contrary, as we have pointed out, the resultant product, according to the teaching, might contain little or much carbon. Said carbon is imparted to the metal in the same manner, and the resultant product obviously possesses the same characteristics as that produced by appellants' process.

The fourth possibility is stated to be that particles might be produced by following the Clements et al. process which contain combined carbon but in a form other than that required by the counts. We think this contention has been sufficiently answered hereinbefore.

An important factor in considering whether or not the invention of the counts is disclosed in the Clements et al. patent is that if the counts at bar are awarded to Patterson et al. upon the grounds urged by them, it would follow that Clements et al. could not practice the process they disclose in their patent (to which the board and we have referred) without infringing the process of the counts. In other words, if Clements et al., by following their process, made and sold a powder which responded to the counts (and appellants seem to concede that it might happen in some circumstances, although in other circumstances it might not happen), they would lay themselves liable to infringement litigation.

It follows from the foregoing that the tribunals below, concurring, as they did, on this highly technical question, arrived at the right conclusion, and the board's

decision holding that Clements et al. have the right to make the count must be affirmed.

We next proceed to the question presented in appellants' brief under the following topic: "If Clements et al have a right to make the counts, they still cannot prevail in this interference because the operations which they disclose are anticipated by the earlier work of Patterson et al."

On this phase of the case the board, in its first decision, went into great detail as to the testimony relating to the early work by Patterson et al. It held, after stating most of the activities of appellants in connection with their alleged conception and reduction to practice of the involved invention, that there was no corroboration of the testimony of the joint inventors on the question of actual reduction to practice or diligence; that assuming that Patterson et al. had a conception of the invention prior to Clements et al., there was no corroboration of diligence on their part as required by law. With this view we agree.

Assuming, without holding, that the testimony of Patterson and of Goetzel shows prior conception of the invention of the counts, there is no testimony which is claimed to corroborate the inventors on the question of reduction to practice except that of Hardy (and instructions and statements of Hardy which are hereinafter referred to) and documents or reports prepared by the inventors (which are self-serving in character). The board agreed with the contention of Clements et al. that the proofs failed to establish conception prior to Clements et al.'s record date, but that even assuming there was such a conception, there was no proper diligence.

■ The only testimony relating to reduction to practice by the early work of Patterson et al. is that of Patterson, Goetzel, and Hardy. With respect to that of the inventors, no one attempted to corroborate it except Charles Hardy, who, at the time of taking testimony, was president of the Hardy Metallurgical Company, assignee of appellants' patent. He is an eminent metallurgist, having vast experience in research in the field of metallurgy and having written extensively on the subject. He, as head of the firm, kept in touch with the work done by the inventors through reports made to him

at frequent intervals, and he directed the continuation of work along certain lines. At no time did he testify that he was present and participated in the actual work or knew anything about it except what was reported to him. Therefore, under the settled rule, as has been pointed out in many cases, and comparatively recently by this court in the case of Collins v. Olsen, 102 F.2d 828, 26 C.C.P.A., Patents, 1017, reduction to practice cannot be proved in this manner. The statements made by an inventor to a superior in the regular line of work are not satisfactory proof of the facts contained in the report.

In the Collins v. Olsen case, supra, it was held, as correctly stated in the syllabus, that: "Statements in reports by appellee, no matter how clear, as to what he used, what he did, and what the results were, cannot be accepted as proof of reduction to practice, unless fully corroborated, even though such reports were made to an official who had such confidence in their accuracy that he was willing to act upon them without complete and independent investigation. While they constitute good evidence of conception, they are self serving on the question of reduction to practice."

■ Appellants seem to urge in their brief that the records kept by Dr. Goetzel corroborate his "statements" inasmuch as, at the time of taking testimony, he had no interest to serve. This fact might have a bearing upon the credibility to attach to Goetzel's testimony regarding conception or reduction to practice if corroborating evidence had been introduced, but it could not supply the requirement of the law that in proving priority of an actual reduction to practice there must be corroboration by someone other than the inventor. No one questions the credibility or truthfulness of the inventors, nor the eminence and truthfulness of Mr. Hardy, but the requirements of the law have not been met and the door should not be thrown open for the occurrence of the evils the rule was designed to prevent.

As to the testimony of Hardy with respect to corroboration, the board had the following to say (and because of its relevancy to the decision of the controlling issue in the case, we quote at considerable length, omitting references to pages of the record):

"At no place in his testimony did Hardy say that the initial carburizing of the powder was achieved by subjecting it while hot to the action of a carburizing gas as required by Count 2. In fact, he did not even mention a carburizing gas. The powders which he said were used in the laboratory experiments in question were apparently not carburized beyond the condition in which they were purchased from the Pittsburg Crushed Steel Company, and there is no testimony as to what the initial carbon content of the powders was, or how the powders were produced.

"Hardy also did not indicate that the annealing of the powders in hydrogen was carried out to the point where the outer portions of the particles were substantially decarburized as required by both counts 1 and 2. In this connection it is believed that a softening of the powder particles sufficient to render them compressible may have occurred more as a result of the annealing treatment than as a result of decarburization caused by the hydrogen, for annealing is a conventional softening and toughening operation. Such decarburization as took place during annealing in an atmosphere of hydrogen may not have decarburized the outer portions of the particles to the extent required by the counts. It cannot be determined from anything in Hardy's testimony that the required decarburizing was accomplished.

"Finally, Hardy did not state that he personally witnessed any of the laboratory work referred to. He identified exhibit 13 as a report from the laboratory which he first saw on the date appearing on the report, November 1, 1937, or within the next few days thereafter. It is the experiments discussed in this report that Hardy was apparently referring to in his oral testimony discussed above and that are relied upon by Patterson et al. as constituting actual reduction to practice. When asked if he was familiar with the work outlined in that report, Hardy answered * * *: 'Yes, I was kept informed regularly at our weekly meetings.'

"The only statement by Hardy which Patterson et al. have pointed out as indicating that Hardy actually witnessed any part of the experimental work is his answer to Question 111 in which he said that the particles "appeared" to have a hard core and a soft skin * * *. Obviously, this statement cannot be taken to mean that the particles appeared to Hardy, from his own personal examination of them, to have a hard core and a soft skin. Hardy's answer to Question 104, quoted above, suggests that Hardy's information was limited to what he was told at regular weekly meetings, and there is nothing in his testimony inconsistent with this suggestion. The burden is on Patterson et al. to prove by the testimony of their single corroborating witness that their alleged reduction to practice was witnessed by him. The witness did not so testify and we cannot assume that such was the case merely because he did not unequivocally testify to the contrary.

"Hardy identified a number of documentary exhibits, namely exhibits 1 to 13 inclusive, and stated with respect to each that he received them on or shortly after the dates which they respectively bear. Exhibits 5 to 11 inclusive obviously have no direct bearing on either conception or reduction to practice of the invention in issue. Some of the others suggested decarburizing or softening without elaboration (exhibits 2, 4, and 12), and exhibit 13 reports the results of the experiments under discussion, but all of these documents omit the same essential information which Hardy's oral testimony failed to disclose. None of these exhibits is believed even to indicate a conception of the invention of either of the counts. However, even if they did disclose the counts and relate all the facts essential to reduction to practice, they are only self-serving declarations of the inventor Patterson in so far as actual reduction to practice is concerned and cannot be relied upon as corroboration on the question of reduction to practice. Like testimony concerning oral declarations by the inventors, they are nothing but hearsay evidence as to what the inventors actually did. Sundberg et al. v. Schmitt, 379 O.G. 441, 1929 C.D. 132, 58 App.D.C. 292, 29 F.2d 880; Collins v. Olsen, 503 O.G. 3, 1939 C.D. 405, 102 F.2d 828, 26 C.C.P.A., Patents, 1017; Bainbridge v. Walton, 509 O.G. 291, 1939 C.D. 803, 104 F.2d 808, 26 C.C.P.A., Patents, 1417; Kear v. Roder, December, 1940, 526 O.G. 293, 115 F.2d 810, 28 C.C.P.A., Patents, 774.

\* \* \* \* \*

"Hardy, the sole corroborating witness, failed to testify as to any activity which would warrant a finding that Patterson et al. were diligent during the critical period. The latest activity to which Hardy

referred was the giving of instructions, 'probably in the early days of 1938,' to continue the research work in all its phases * * *. Regardless of what may appear in the testimony of Patterson and Goetzel, therefore, as to activity during the critical period, the absence of any corroboration as to their activity during that period precludes a finding that they were diligent. Malcolm v. Richards, 250 O.G. 1000, 1918 C.D. 171, 47 App.D.C. 582."

For the reasons stated by the board, we are in agreement with its conclusion that Hardy's testimony cannot be regarded as sufficiently corroborative of the testimony of the inventors with respect to either reduction to practice or diligence (in the event a conception of the invention is shown) and that therefore Patterson et al. have failed to prove priority of the invention involved.

The decision of the Board of Interference Examiners awarding priority as to the subject matter in issue to Clements et al. is affirmed.

Affirmed.

LENROOT, Associate Judge, took no part in the consideration or decision of this case.