Peter B. COOPER, Appellant,

v.

David GOLDFARB, Appellee.

No. 97–1302.

United States Court of Appeals,
Federal Circuit.

Sept. 1, 1998.

Donald R. Dunner, Finnegan, Henderson, Farabow, Garrett & Dunner, L.L.P., argued for appellant. With him on the brief were Albert J. Santorelli, Barbara C. McCurdy, and Howard A. Kwon.

D. Dennis Allegretti, Burns & Levinson, Boston, Massachusetts, argued for appellee. With him on the brief were Lawrence M. Green and Matthew B. Lowrie, Wolf, Greenfield & Sacks, P.C., Boston, Massachusetts. Of counsel on the brief was Francis Paintin, Woodcock, Washburn, Kurtz, Mackiewicz & Norris, Philadelphia, Pennsylvania.

Before CLEVENGER, Circuit Judge, SKELTON, Senior Circuit Judge, and SCHALL, Circuit Judge.

SCHALL, Circuit Judge.

Peter B. Cooper appeals from the decision of the United States Patent and Trademark Office (PTO) Board of Patent Appeals and Interferences (the Board) awarding priority of invention to Dr. David Goldfarb for expanded polytetraflouroethylene (PTFE) artificial vascular grafts. *See Goldfarb v. Cooper*, Patent Interference No. 101,100 (Bd. Pat.App. & Int. Oct. 18, 1995) (Final Decision); *Goldfarb v. Cooper*, Patent Interference No. 101,100 (Bd. Pat.App. & Int. Dec. 19, 1996) (Reconsideration Decision). We affirm the Board's determination that Goldfarb was the first to reduce the invention to practice. However, we reverse the Board's determination that Cooper failed to properly raise the issue of inurement, and we remand to allow the Board to consider whether Goldfarb's efforts inure to the benefit of Cooper.

## BACKGROUND

A. *The Technology*

The invention at issue in this interference relates to an artificial vascular graft constructed from expanded PTFE tubing. Expanded PTFE is a flexible membrane constructed by stretching heated PTFE. W.L.

Gore & Associates (Gore) sells expanded PTFE under the brand name "Gore–Tex." In the early 1970s, expanded PTFE was manufactured by: (1) forming a batch of paste from a PTFE resin and a lubricant; (2) separating a portion of the batch and shaping it into a cylinder; (3) extruding the cylinder into a short tube ("the extrudate"); (4) heating and drying the extrudate; (5) stretching the heated extrudate by pulling the ends apart by hand, resulting in a tube approximately ten times its original length; (6) heating the stretched tube above its melting temperature to sinter, or lock, the material, thereby making it stronger when it cooled; and (7) cooling the tube on a rack. The stretching process produces a PTFE structure consisting of solid nodes of PTFE connected by thin PTFE fibrils. The distance between the nodes is referred to as "fibril length" or "inter-nodal distance." It is this factor which in large part determines the suitability of the product for use as a vascular graft. The primary dispute presented by the interference concerns which of the parties was the first to recognize the importance of fibril length and which was the first to reduce the invention to practice by performing a successful experiment using the claimed structure.

## B. *Cooper's Research Activities*

Research into the use of expanded PTFE as a vascular graft began in 1972, when Gore, in conjunction with several surgeons, conducted a series of experiments to determine the suitability of expanded PTFE as a vascular graft. In November of 1972, Cooper, the Plant Manager of Gore's facility in Flagstaff, Arizona, sent three types of expanded PTFE tubing to a number of surgeons for evaluation. Among the surgeons receiving the samples were Dr. William Sharp, of the Akron City Hospital, in Akron, Ohio, and Dr. Glenn Kelly, of the University of Colorado Medical School, in Denver, Colorado. Re-

ferred to as the "three-structure experiment," this initial research involved experiments with small, medium, and large "pore size" grafts.[1] In the early stages of the research, the participants believed that "pore size" was the key parameter determining success as a vascular graft. During the course of the research, however, it became clear that fibril length was the critical factor. In order to function successfully, the fibrils connecting the PTFE nodes must be of sufficient length to permit infiltration by fibroblasts and red blood cells, thereby leading to tissue ingrowth into the walls of the graft.[2] However, the fibrils must not be so long as to allow excessive bleeding through the walls of the graft.

In order to evaluate the performance of an artificial vascular graft, a surgeon ordinarily implants the tube-shaped sample in a blood vessel of a dog, and then harvests and examines the graft several weeks later. In 1972–73, the accepted test for viability of a graft material was whether a graft implanted in a dog remained "patent" for 21 days. The term "patent" means that a graft is clear, unobstructed, and permits blood to flow through the length of the graft. The parties agree that a single successful graft in a dog would constitute an actual reduction to practice.

In the spring of 1973, the researchers participating in the three-structure experiment began obtaining results. In a letter dated April 2, 1973, Dr. Sharp informed Cooper that two of his grafts had been successful. The letter stated:

RESULTS: Group I—416–10312–3 (.31g/cc). There were a total of four grafts inserted into the dog's carotid artery. Two remained patent in the same animal for 21 days and 2 clotted before 21 days in another animal. The low power microscopic views demonstrate excellent fibrob-

1. "Pore size" is a measure of membrane permeability and represents the diameter of the largest theoretical pore in the membrane. Pore size is calculated by measuring the pressure of air forced through a membrane soaked in alcohol. Using a formula, pore size can be determined based on the lowest pressure at which a steady stream of bubbles is produced. The parties agree that pore size bears no relationship to fibril

length. For example, a graft having long fibrils with small distances between them could have the same pore size as a graft having short fibrils with large distances between them.

2. A "fibroblast" is a connective tissue cell. *See Dorland's Illustrated Medical Dictionary* 626 (28th ed. 1994)

lastic infiltration of the wall of the graft (Figure # 1) and a fairly thick, but well attached neointima (Figure # 2). There was only moderate reaction externally. (Figure # 3).

On April 17, 1973, Dr. Kelly sent Cooper four histological slides of harvested grafts. Cooper testified that he reviewed the slides under a microscope on April 22, 1973, and then photographed the slides, measured the fibril lengths shown, and recorded his conclusions in his laboratory notebook. The first page of Cooper's notebook contains a photomicrograph of a harvested graft along with a notation indicating that the graft was submitted by Dr. Kelly. The page also contains a sticker with a 100 micron scale indicated. The following is written above the photomicrograph:

I want to maximize the amount and rate of tissue ingrowth into Gore–Tex vascular prosthetics. Two qualities are necessary. 1. Uniform "poker chip" structure and 2. a minimal "skin" at both the O.D. and I.D. surfaces.

Tissue has invaded Gore–Tex where the nodes are approx. 10-30 microns thick and with most separations between nodes at about 50–100 microns. Photo # 1. Other structures having approximately 5–10 micron node dimensions and spaces from about 5–30 micron do not appear to allow ingrowth—Photo # 2.

The page is signed "Peter B. Cooper/May 1, 1973" and "Read & Understood By" "John Giovale/June 5, 1973." John Giovale, a Gore manufacturing engineer, confirmed that Cooper had shown him the photographs and discussed with him the need for sufficient internodal separation in order to allow tissue ingrowth.

The next page of Cooper's laboratory notebook is dated May 2, 1973. It refers to Dr. Kelly's experiments and samples submitted by Dr. Kelly. The page bears the following notation: "Both [samples] from Dr. Glenn Kelly U of Colorado. Femoral Vein in Dogs—Both Failed." The page was signed

by Cooper on May 2 and was read and understood by Giovale on June 5.

Cooper filed Patent Application No. 05/457,711 on April 2, 1974, claiming the use of expanded PTFE as a vascular graft.[3] Cooper claimed conception as of May 1, 1973, based on the statements in his lab notebook as corroborated by Giovale. He also claimed a reduction to practice by May 1, 1973, based on Dr. Kelly's experiments, or in the alternative, based on Dr. Sharp's experiments.

### C. Goldfarb's Research Activities

In January of 1973, Goldfarb moved to Phoenix, Arizona, to assume the position of Director of Research and Clinical Staff Surgeon at the Arizona Heart Institute (AHI). At that time, Goldfarb had been studying artificial vascular grafts, including PTFE, for ten years. Shortly after assuming his new position, Goldfarb was contacted by Richard Mendenhall, a Gore employee responsible for marketing PTFE. Mendenhall wanted to discuss whether AHI would be willing to test expanded PTFE vascular grafts. On February 2, 1973, Mendenhall sent a letter to Goldfarb and enclosed several articles about Gore–Tex and samples of the material.

Following a meeting with Cooper and Mendenhall in early February, Goldfarb set up an animal research facility at AHI. Over the next several months, Cooper periodically sent Goldfarb a variety of expanded PTFE tubes to use in his research. Using the samples provided by Cooper, Goldfarb conducted a series of experiments consisting of 21 grafts implanted in the left and right carotid and left and right femoral arteries of seven dogs. These experiments were corroborated by Goldfarb's assistant, Jimmy Lee Moore. Goldfarb began obtaining results from these experiments towards the end of May of 1973. On May 23, 1973, the "2–73 RC" graft was harvested, and on June 13, 1973, the "2–73 RF" graft was harvested.[4] Histological slides made from these specimens revealed that the grafts were patent

---

3. Gore has been assigned the right to any patent that issues from this application.

4. The designation "2–73" refers to the particular animal used in the experiment. The designation

"RC" indicates that the graft was inserted in the right carotid artery, while the designation "RF" indicates that the graft was inserted in the right femoral artery.

and therefore successful. Goldfarb testified that he examined each graft, both before and after implantation, using a microscope with a calibrated eyepiece to measure fibril length. However, no documentary or testimonial evidence was presented to directly corroborate his testimony that he measured the fibril length of the successful grafts. The actual microstructure of the successful grafts was not established by corroborated evidence until 1984, when subsequent testing revealed that the 2–73 RF graft had a fibril length within the range of the interference count.

Goldfarb testified that in May or June of 1973, he disclosed to Mendenhall and Harold Green, a Gore chemical engineer, that a successful expanded PTFE graft should have a fibril length of 5 to 100 microns. Mendenhall confirmed that Goldfarb had discussed pore sizes with him in the range of 5 to 112 microns in the spring of 1973. For his part, Green confirmed that, in June or July of 1973, Goldfarb had requested a graft having a fibril length of 5 to 112 microns.[5]

Goldfarb filed Patent Application No. 05/517,415 on October 24, 1974, claiming the use of expanded PTFE as a vascular graft. Goldfarb asserted conception as of February 8, 1973, based on disclosures allegedly made during his meeting that day with Cooper and Mendenhall. Goldfarb claimed a reduction to practice as of June 30, 1973, based on the successful 2–73 RF graft.

### D. The Interference Proceeding

On September 19, 1983, the PTO declared an interference between Patent Application No. 05/457,711, filed by Cooper, the senior party, and Patent Application No. 05/517,415, filed by Goldfarb, the junior party. Count 2,

the count at issue in the interference,[6] *reads as follows:*

An artificial vascular prosthesis comprising expanded, porous, polytetraflouroethylene having a microstructure consisting of nodes interconnected by fibrils which permits tissue ingrowth, wherein said fibrils are above about 5 microns up to 100 microns in length.

As the junior party in an interference between co-pending applications, Goldfarb bore the burden of proving priority by a preponderance of the evidence. *See Scott v. Finney,* 34 F.3d 1058, 1061, 32 U.S.P.Q.2d 1115, 1117 (Fed.Cir.1994). After extensive interference proceedings lasting over 12 years, the Board issued its final decision on October 18, 1995. In the decision, the Board concluded that Cooper had conceived the invention as of June 5, 1973, as evidenced by the statements in his laboratory notebook and Giovale's testimony. However, the Board held that Cooper had failed to establish a reduction to practice before July of 1973, because Dr. Kelly's experiments were unsuccessful and because the grafts used in Dr. Sharp's successful experiments had not been shown to meet the limitations of the count. As for Goldfarb's research activities, the Board concluded that he had failed to establish conception prior to Cooper. However, the Board determined that Goldfarb had established both conception and reduction to practice by July of 1973. In view of the fact that Cooper did not allege any further actual reduction to practice until August 21, 1973, and did not contend that he exercised diligence, the Board awarded priority of inven-

---

5. Although Green testified during a deposition in 1988 that he could not remember specifically what was said in 1973, he confirmed the truth of a 1975 deposition and a 1976 affidavit. In the 1976 affidavit, Green stated that Dan Detton, Director of Medical Projects for Gore, had given him detailed specifications requested by Goldfarb that corresponded to the specifications set forth in the interference count. The affidavit also stated that because the specifications were substantially different from specifications previously used, Green contacted Goldfarb to confirm them. In his 1975 deposition, Green stated that the structure requested by Goldfarb included a fibril length of 5 to 112 microns and that the request was made in June or July of 1973.

6. The original count of the interference, count 1, was identical to count 2 except that it omitted the 100 micron upper limit on fibril length. In a decision dated December 18, 1985 (Paper No. 50), the primary examiner granted a motion by Cooper to substitute count 2 for count 1 in order to eliminate one ground of unpatentability alleged by Goldfarb. Count 3, which was added later, was eventually dismissed when the Board determined that count 3 was not patentably distinct from count 2. That determination has not been appealed.

tion to Goldfarb because he had established the earlier reduction to practice.

In a motion for reconsideration, Cooper argued that Goldfarb's reduction to practice by July of 1973 should inure to his benefit. However, in its reconsideration decision, the Board refused to reach the merits of Cooper's argument on the ground that he had failed to raise it in his brief for final hearing.

On appeal, Cooper contends that the Board erred by (1) failing to find that he had an earlier successful reduction to practice; (2) erroneously finding that Goldfarb had successfully reduced the invention to practice by July of 1973; and (3) failing to address the argument that Goldfarb's reduction to practice inures to Cooper's benefit. We have jurisdiction pursuant to 28 U.S.C. § 1295(a)(4)(A) (1994).

## DISCUSSION

### A. The Law of Interferences and the Standard of Review

■■■ When a patent application is filed which would interfere with any pending application or with any unexpired patent, the Commissioner of the PTO is authorized to declare an interference to determine which party was the first to invent the claimed subject matter. See 35 U.S.C. § 135(a) (1994). In determining priority of invention, the Board must consider "not only the respective dates of conception and reduction to practice of the invention, but also the reasonable diligence of one who was first to conceive and last to reduce to practice, from a time prior to conception by the other." 35 U.S.C. § 102(g) (1994). Accordingly, priority of invention goes to the first party to reduce an invention to practice unless the other party can show that it was the first to conceive of the invention and that it exercised reasonable diligence in later reducing that invention to practice. See Price v. Symsek, 988 F.2d 1187, 1190, 26 U.S.P.Q.2d 1031, 1033 (Fed.Cir.1993). Priority therefore depends upon conception and reduction to practice. Priority, conception, and reduction to practice are questions of law which are based on subsidiary factual findings. See Hybritech Inc. v. Monoclonal Antibodies, Inc., 802 F.2d 1367, 1376, 231 U.S.P.Q. 81, 87 (Fed.Cir. 1986); Price, 988 F.2d at 1190, 26 U.S.P.Q.2d

at 1033. We review the Board's legal conclusions concerning priority, conception, and reduction to practice de novo, and its factual findings for clear error. See Hybritech, 802 F.2d at 1376, 231 U.S.P.Q. at 87; Holmwood v. Sugavanam, 948 F.2d 1236, 1238, 20 U.S.P.Q.2d 1712, 1714 (Fed.Cir.1991).

### B. Cooper's Conception and Reduction to Practice

■■■ Conception is the formation, in the mind of the inventor, of a definite and permanent idea of the complete and operative invention, as it is thereafter to be applied in practice. See Hybritech, 802 F.2d at 1376, 231 U.S.P.Q. at 87 (citing Coleman v. Dines, 754 F.2d 353, 359, 224 U.S.P.Q. 857, 862 (Fed.Cir.1985)). A reduction to practice can be either a constructive reduction to practice, which occurs when a patent application is filed, or an actual reduction to practice. See Hybritech, 802 F.2d at 1376, 231 U.S.P.Q. at 87. In order to establish an actual reduction to practice, the inventor must prove that: (1) he constructed an embodiment or performed a process that met all the limitations of the interference count; and (2) he determined that the invention would work for its intended purpose. See UMC Elecs. Co. v. United States, 816 F.2d 647, 652, 2 U.S.P.Q.2d 1465, 1468 (Fed.Cir.1987) ("[T]here cannot be a reduction to practice of the invention ... without a physical embodiment which includes all limitations of the claim."); Estee Lauder Inc. v. L'Oreal S.A., 129 F.3d 588, 593, 44 U.S.P.Q.2d 1610, 1614 (Fed.Cir.1997) ("[A] reduction to practice does not occur until the inventor has determined that the invention will work for its intended purpose."). Depending on the character of the invention and the problem it solves, determining that the invention will work for its intended purpose may require testing. See Mahurkar v. C.R. Bard Inc., 79 F.3d 1572, 1578, 38 U.S.P.Q.2d 1288, 1291 (Fed.Cir. 1996). When testing is necessary, the embodiment relied upon as evidence of priority must actually work for its intended purpose. See Scott, 34 F.3d at 1061, 32 U.S.P.Q.2d at 1117. In addition, the inventor must contemporaneously appreciate that the embodiment worked and that it met all the limitations of the interference count. See Estee Lauder, 129 F.3d at 594–95, 44 U.S.P.Q.2d at 1615

("[W]hen testing is necessary to establish utility, there must be recognition and appreciation that the tests were successful for reduction to practice to occur."); *Knorr v. Pearson,* 671 F.2d 1368, 1375, 213 U.S.P.Q. 196, 202 (CCPA 1982) ("Where a count to a mechanical invention includes a structural feature recited as a positive limitation, conception and reduction to practice of that invention require a contemporaneous recognition of that feature.").

Based on the entries in Cooper's laboratory notebook indicating that he had conceived all the limitations of the count, as well as Giovale's testimony, the Board found that Cooper had established conception as of June 5, 1973, the date Giovale signed the notebook. However, the Board held that this evidence was insufficient to show an actual reduction to practice as of June 5, 1973, because the notebook indicated that Dr. Kelly's experiments were a failure. The Board concluded that, in view of the indication that the Kelly experiments had failed, those experiments could not constitute an actual reduction to practice, which requires testing sufficient to establish that the invention is suitable for its intended purpose. The Board also rejected Cooper's argument that the successful experiments conducted by Dr. Sharp at the Akron City Hospital constituted an actual reduction to practice. As far as those experiments were concerned, the Board concluded that there was no corroborated evidence showing that the grafts used by Dr. Sharp had a fibril length structure within the parameters of the interference count. The Board rejected Cooper's argument that the grafts from lot 416–10312–3,[7] which were used successfully by Dr. Sharp, had the same fibril length as the grafts from lot 416–11172–10, which were used unsuccessfully by Dr. Kelly but met the count.[8] "[W]hile Cooper may have intended for the two lots to be identical . . . we find no corroborated evidence that they were in fact the same," stated the Board. The Board noted that there was no evidence that the lot used by Dr. Sharp was microscopically examined to determine its fibril length. Therefore, the Board concluded that Dr. Sharp's experiments could not serve as a reduction to practice.

On appeal, Cooper contends that the Board erred by failing to view the evidence as a whole and by holding him to an improper standard of proof. In particular, he contends that the Board erred by failing to find that lot 416–10312–3 had the same structure as lot 416–11172–10. Cooper argues that the totality of the evidence supports the conclusion that Dr. Sharp's graft met the requirements of the count. In so arguing, Cooper notes his own testimony, in which he stated that "the grafts supplied at various times to various researchers were made to be as close as possible, one to the other." Cooper also notes that Douglas Walter, a technician responsible for making expanded PTFE grafts for Gore in 1972–75, testified that grafts having the same structural parameters could be repeatedly reproduced on different days. Cooper argues that this evidence, taken as a whole, supports the conclusion that Dr. Kelly's graft and Dr. Sharp's graft had the same fibril length. We disagree.

■ A party cannot rely upon tests performed on a composition that fails to meet the limitations of the interference count to demonstrate that the composition works for its intended purpose. *See Estee Lauder,* 129 F.3d at 595, 44 U.S.P.Q.2d at 1615. Accordingly, the physical embodiment relied upon as an actual reduction to practice must include every limitation of the count. *See Correge v. Murphy,* 705 F.2d 1326, 1329, 217 U.S.P.Q. 753, 755 (Fed.Cir.1983). What this means is that, in order to rely on Dr. Sharp's successful experiment as a reduction to practice, Cooper was required to establish that Dr. Sharp's graft had fibril lengths within the parameters of the count. We agree with the Board that Cooper failed to make the requisite showing.

■ Cooper presented no direct evidence that the fibril lengths of Dr. Sharp's grafts

---

7. Gore assigned a lot number (XXX–YYYYY–ZZ) to each full length of expanded tubing. The first three digits identify the PTFE extrudate used for the expansion. The next five digits identify the date on which the expansion was performed. The last number specifies the number of the expansion done on that day.

8. Goldfarb does not dispute that the graft used unsuccessfully by Dr. Kelly had fibril lengths that met the count.

met the limitations of the count. Instead, Cooper asks us to infer that the grafts met the limitations of the count because (1) Dr. Kelly's grafts met the count, and (2) both grafts were intended to have the same structure. Cooper admits, however, that various manufacturing parameters affect fibril length, including the particular resin, the type of lubricant, the extrusion temperature, the barrel temperature of the extruder, the extrusion rate, the extruder shape, the reduction ratio, the amount of expansion, and the expansion rate. In addition, Harold Green, the individual responsible for manufacturing expanded PTFE tubing for Gore in 1972–73, testified that during that time period, Gore had difficulty controlling the uniformity of the PTFE material.

Cooper concedes that the Sharp and Kelly grafts came from an extrudate which was expanded on different days. Cooper also acknowledges that expansions which are performed by hand, as was the case with the extrudate at issue, are inherently imprecise. Furthermore, Green testified that even if the two grafts came from the same expansion, the fibril lengths still may not have been the same because fibril lengths vary along each tube. Goldfarb also testified that fibril length "varied tremendously, not only from graft to graft but within the same graft." Finally, although Douglas Walter testified that he believed that grafts produced on different days would have the same structure, he admitted that he never personally viewed grafts under a microscope to confirm his belief.

Based upon the foregoing, we cannot say that the Board erred in holding that Cooper had failed to establish a reduction to practice based on Dr. Sharp's experiments in the spring of 1973.

## C. Goldfarb's Conception and Reduction to Practice

After considering the entirety of the evidence, the Board concluded that Goldfarb had established conception of the invention by at least July of 1973. The Board recognized that there was no evidence in the record of contemporaneous notes from Goldfarb's observations of histological slides, nor any testimony that any witness observed Goldfarb looking at the slides. Nonetheless, the Board found that the testimony of Mendenhall and Green credibly corroborated Goldfarb's conception.

The Board also held that Goldfarb had established an actual reduction to practice by July of 1973. The Board concluded that Goldfarb had measured fibril lengths and had contemporaneously recognized that the grafts used in his experiments met the count. The Board found that Goldfarb's testimony to the effect that he measured the fibril length of the 2–73 RF graft was corroborated by the fact that two witnesses testified that he subsequently had in mind a structure which corresponded to the count.[9]

On appeal, Cooper argues that the Board erred in concluding that Goldfarb had reduced the invention to practice by July of 1973. Cooper contends that Goldfarb failed to appreciate at that time that the successful graft embodied all the limitations of the count. Cooper states that the record is devoid of contemporaneous corroborating evidence showing that Goldfarb examined the successful grafts to determine their fibril length prior to 1984 when testing confirmed their actual microstructure. According to Cooper, the testimony of Mendenhall and Green constitutes mere repetition of what Goldfarb claims he knew at the time and thus cannot be deemed sufficient in and of itself to corroborate Goldfarb's reduction to practice. Finally, Cooper contends that the Board erred by considering nunc pro tunc evidence generated by Goldfarb eleven years after the events in question to conclude that Goldfarb had been in possession of the invention in July of 1973.

---

9. In its final decision, the Board found an actual reduction to practice based on both the 2–73 RC graft as well as the 2–73 RF graft. However, in its reconsideration decision, the Board modified its previous decision to note that the testing of graft 2–73 RC was not an actual reduction to practice because the fibril length of this graft was never established in the record. However, since the test of the 2–73 RF graft was successful, this modification did not alter the Board's ultimate conclusion.

■ We must reject Cooper's arguments. In order to establish an actual reduction to practice, an inventor's testimony must be corroborated by independent evidence. *See Knorr v. Pearson,* 671 F.2d 1368, 1373, 213 U.S.P.Q. 196, 200 (CCPA 1982). However, a "rule of reason" analysis is applied to determine whether an inventor's testimony regarding reduction to practice has been sufficiently corroborated. *See Holmwood,* 948 F.2d at 1238, 20 U.S.P.Q.2d at 1714. The rule requires an evaluation of all pertinent evidence when determining the credibility of an inventor's testimony. *See Price,* 988 F.2d at 1195, 26 U.S.P.Q.2d at 1037. In order to corroborate a reduction to practice, it is not necessary to produce an actual over-the-shoulder observer. Rather, sufficient circumstantial evidence of an independent nature can satisfy the corroboration requirement. *See Knorr,* 671 F.2d at 1373, 213 U.S.P.Q. at 200. Furthermore, an actual reduction to practice does not require corroboration for every factual issue contested by the parties. *See Ethicon, Inc. v. United States Surgical Corp.,* 135 F.3d 1456, 1464, 45 U.S.P.Q.2d 1545, 1551 (Fed.Cir.1998); *Mann v. Werner,* 52 C.C.P.A. 1578, 347 F.2d 636, 640, 146 U.S.P.Q. 199, 202 (1965) ("This court has rejected the notion that each individual act in the reduction to practice of a count must be proved in detail by an unbroken chain of corroboration.").

■ Although no direct evidence supported Goldfarb's testimony that he measured fibril length and observed tissue ingrowth in July of 1973, we agree with the Board that circumstantial evidence provided sufficient corroboration. Goldfarb testified that he examined fibril length at the time of the successful implant. His testimony was corroborated by the testimony of Mendenhall and Green. Their testimony was to the effect that: (1) Goldfarb was examining fibril length when he performed the implants; (2) after the successful implants Goldfarb stated that fibril lengths within the count were required; and (3) Goldfarb asked for new tubing having fibril lengths within the count. This evidence corroborates Goldfarb's testimony because it is consistent with his having recognized that the 2–73 RF slide was a successful embodiment of the invention. Accordingly, we cannot say that the Board's

conclusion that Goldfarb measured the fibril lengths was clearly erroneous.

We find no merit in Cooper's argument that *Patterson v. Clements,* 30 C.C.P.A. 1262, 136 F.2d 1002, 58 U.S.P.Q. 539 (1943), precludes reliance on the testimony of Mendenhall and Green as corroboration of Goldfarb's reduction to practice. In *Patterson,* the Court of Customs and Patent Appeals held that testimony by an inventor's superior concerning oral declarations made to him by the inventor could not be relied upon as corroboration of a reduction to practice. *See* 136 F.2d at 1007, 58 U.S.P.Q. at 545 (citing *Collins v. Olsen,* 26 C.C.P.A. 1017, 102 F.2d 828, 41 U.S.P.Q. 220 (1939)). The court reasoned that such evidence was simply self-serving hearsay. *See Patterson,* 136 F.2d at 1007, 58 U.S.P.Q. at 545. Significantly, in *Patterson,* no independent evidence was offered to corroborate the reduction to practice. Although *Patterson* pre-dated adoption of the "rule of reason" standard, *see Berges v. Gottstein,* 618 F.2d 771, 205 U.S.P.Q. 691 (CCPA 1980), more recent cases have acknowledged that "adoption of the 'rule of reason' has not altered the requirement that evidence of corroboration must not depend solely on the inventor himself." *Reese v. Hurst,* 661 F.2d 1222, 1225, 211 U.S.P.Q. 936, 940 (CCPA 1981); *see also Hahn v. Wong,* 892 F.2d 1028, 1032, 13 U.S.P.Q.2d 1313, 1317 (Fed. Cir.1989) ("The inventor ... must provide independent corroborating evidence in addition to his own statements and documents.").

Here, in line with these cases, corroboration of Goldfarb's reduction to practice does not depend solely on statements or writings by the inventor himself. Goldfarb's actual reduction to practice is established in part by independent evidence, such as Moore's testimony regarding the graft experiments conducted by Goldfarb and the evidence concerning the testing of the graft material in 1984. This evidence independently corroborates Goldfarb's testimony that he conducted a successful experiment using a graft that met the limitations of the count. Cooper contends nevertheless that Goldfarb failed to independently corroborate his testimony that he measured the fibril lengths of the successful 2–73 RF graft, thereby satisfying the

requirement that he appreciate that the graft was within the scope of the count. As we stated in *Knorr*, however, "[t]he law does not impose an impossible standard of 'independence' on corroborative evidence by requiring that every point of a reduction to practice be corroborated by evidence having a source totally independent of the inventor; indeed, such a standard is the antithesis of the rule of reason." *Knorr*, 671 F.2d at 1374, 213 U.S.P.Q. at 201. "In the final analysis, each corroboration case must be decided on its own facts with a view to deciding whether the evidence as a whole is persuasive." *Berges*, 618 F.2d at 776, 205 U.S.P.Q. at 695. We believe that Goldfarb's statements to Mendenhall and Green shortly after harvesting the 2–73 RF graft, in which he explained the importance of fibril lengths within the parameters of the interference count and in which he requested construction of such membranes, serve to corroborate his testimony that he measured the fibril lengths of the 2–73 RF graft. In short, we agree with the Board that the evidence as a whole corroborates Goldfarb's reduction to practice.

■ We also conclude that the Board did not err by considering evidence that the 2–73 RF graft was determined to meet the limitations of the interference count in 1984. The rule that conception and reduction to practice cannot be established *nunc pro tunc* simply requires that in order for an experiment to constitute an actual reduction to practice, there must have been contemporaneous appreciation of the invention at issue by the inventor. *See Estee Lauder*, 129 F.3d at 593, 44 U.S.P.Q.2d at 1614. Subsequent testing or later recognition may not be used to show that a party had contemporaneous appreciation of the invention. However, evidence of subsequent testing may be admitted for the purpose of showing that an embodiment was produced and that it met the limitations of the count. *See Silvestri v. Grant*, 496 F.2d 593, 598, 181 U.S.P.Q. 706, 709 (CCPA 1974); *Gianladis v. Kass*, 51 C.C.P.A. 753, 324 F.2d 322, 326 n. 8, 139 U.S.P.Q. 300, 304 n. 7 (1963). In this case, the Board did not rely on the 1984 tests to infer that Goldfarb knew the fibril lengths of the 2–73 RF graft in 1973. Instead, the Board relied on the tests merely to confirm that the 2–73 RF graft met the count. Such use of the subsequent test results was proper. Cooper has failed to establish error in the Board's determination that Goldfarb had conceived the invention and reduced it to practice by July of 1973.

### D. *Inurement*

In a motion for reconsideration, Cooper argued to the Board that Goldfarb's reduction to practice in July of 1973 should inure to his benefit. The Board concluded, however, that Cooper had not raised this argument anywhere in his brief for final hearing; it therefore refused to consider it. The Board reasoned that Cooper's only mention of inurement concerned Goldfarb's activities after July of 1973, or concerned count 3 which was no longer in issue. On appeal, Cooper argues that the inurement issue was adequately raised in his final hearing brief before the Board. We agree.

■ A party cannot wait until after the Board has rendered an adverse decision and then present new arguments in a request for reconsideration. *See Moller v. Harding*, 214 U.S.P.Q. 730, 731, 1982 WL 50429 (Pat.& Tr.Office Bd.App. 1982), *aff'd*, 714 F.2d 160 (Fed.Cir.1983) (table). The question of whether a party properly raised an issue is a question of law based on subsidiary factual findings. In this case, there is no factual dispute as to what statements were contained in Cooper's final hearing brief. The only dispute concerns the legal significance to be accorded the statements. Accordingly, we review the Board's conclusion that these statements did not adequately raise the inurement issue *de novo*.

■ Inurement involves a claim by an inventor that, as a matter of law, the acts of another person should accrue to the benefit of the inventor. *See, e.g., Gianladis*, 324 F.2d at 328, 139 U.S.P.Q. at 305 (attorney's efforts inure to benefit of inventor in establishing diligence). In particular, experiments conducted at the request of an inventor by another party may inure to the benefit of the inventor for purposes of establishing a reduction to practice. *See, e.g., Burroughs Wellcome Co. v. Barr Labs., Inc.*, 40 F.3d 1223, 1230, 32 U.S.P.Q.2d 1915, 1921–22 (Fed.Cir. 1994) (testing of AZT medication by scientists at the National Institutes of Health

inures to the benefit of the pharmaceutical manufacturer that conceived the invention); *D'Silva v. Drabek*, 214 U.S.P.Q. 556, 563, 1981 WL 46261 (Pat.& Tr. Office Bd.App. 1981) (testing of insecticide by other scientists inures to the benefit of the researcher that conceived the compound); 3 Donald S. Chisum, *Chisum on Patents* § 10.06[3] (1995) ("The inventor need not personally reduce to practice his complete conception. Acts by others working explicitly or implicitly at the inventor's request will inure to his benefit.").

■ Cooper discussed the issue of inurement in several places in his final hearing brief. For example, he argued at page 58 of the brief that "[t]o the extent the testing of [lot] 459–04133–9 by Goldfarb is a reduction to practice of count 3 by June 30, 1973, as Goldfarb alleges, it inures to Cooper's benefit." [10] Although Cooper referred only to count 3 when discussing the significance of Goldfarb's activities prior to July of 1973, the Board determined that counts 2 and 3 were not patentably distinct. Accordingly, the inurement argument made with respect to count 3 is fully applicable to count 2. Both the factual and legal issues are identical. Therefore, any inurement argument with respect to count 3 is equivalent to an inurement argument with respect to count 2. In addition, we note that Goldfarb addressed the merits of Cooper's inurement arguments in his final hearing brief. Accordingly, we conclude that Cooper adequately raised the argument that Goldfarb's activities prior to July of 1973 inure to his benefit, and that the Board therefore erred by failing to consider the issue.

■ Goldfarb contends that, even if we determine that Cooper properly raised the inurement issue, we should hold that Cooper's inurement argument fails as a matter of law because Cooper did not raise, argue, or prove derivation before the Board. According to Goldfarb, in the context of priority contests between two inventors, inurement simply means derivation. We disagree. Derivation involves the claim that the adverse party did not "invent" the subject matter of the count because that party derived the invention from another. *See Price*, 988 F.2d at 1190, 26 U.S.P.Q.2d

at 1033. To prove derivation in an interference proceeding, the party asserting derivation must establish prior conception of the claimed subject matter and communication of the conception to the adverse claimant. *See id.* As just noted, however, inurement involves the claim that, as a matter of law, another person's activities should accrue to the benefit of the inventor. In order to establish inurement, an inventor must show, among other things, that the other person was working either explicitly or implicitly at the inventor's request. *See* Chisum, *supra*, § 10.06[3]. While derivation focuses on the communication of information between two parties, inurement focuses on the nature of the relationship between them. Communication of the conception by the inventor to the other party is not required to establish inurement. *See, e.g., Burroughs Wellcome*, 40 F.3d at 1228–32, 32 U.S.P.Q.2d at 1921–22 (holding that a reduction to practice by a third party inures to the benefit of the inventor even without communication of the conception). In this case, depending on the exact nature of the relationship between Goldfarb and Cooper, Goldfarb's reduction to practice could inure to the benefit of Cooper even if Goldfarb independently conceived the invention in the course of performing experiments at Cooper's request.

■ Although both parties urge us to resolve the inurement issue here, a determination of whether Goldfarb's activities inure to the benefit of Cooper requires findings of fact with respect to the nature of the relationship between the two parties. *See, e.g., Borglin v. Palmer*, 70 F.2d 899, 900, 21 U.S.P.Q. 587, 588 (CCPA 1934) (analyzing nature of relationship between inventor and other party). While we recognize that both parties desire a speedy resolution of this interference, we believe that the Board should make the necessary factual findings in the first instance. *See Myers v. Feigelman*, 59 C.C.P.A. 834, 455 F.2d 596, 604, 172 U.S.P.Q. 580, 587 (1972) ("While we undoubtedly have the power to proceed on our own and decide questions not reached by the

---

**10.** Lot 459–04133–9 is the lot that was used by Goldfarb for the 2–73 RF graft.

board ... in this case we remand to allow the board to make a fully focused inquiry into this difficult question." (citation and footnote omitted)). We therefore conclude that a remand to the Board is appropriate to allow it to consider the inurement issue.

## CONCLUSION

We find no error in the Board's holding that Goldfarb was the first to reduce the invention to practice. However, the Board did err by failing to consider whether Goldfarb's efforts inure to the benefit of Cooper. Accordingly, the Board's determination that Goldfarb was the first to reduce the invention to practice is affirmed. Its determination that Cooper failed to raise the inurement issue is reversed, and the case is remanded to allow the Board to consider whether Goldfarb's efforts inure to the benefit of Cooper.

## COSTS

Each party shall bear its own costs.

*AFFIRMED–IN–PART, REVERSED–IN PART, and REMANDED.*