**MEDTRONIC, INC., Plaintiff,**

v.

**Geoffrey WHITE, Defendant.**

**Los Angeles Biomedical Research Institute at Harbor–Ucla Medical Center, Third–Party Intervenor and Plaintiff,**

v.

**Geoffrey White, Defendant.**

**No. C 04–2201 JSW.**

United States District Court, N.D. California.

April 21, 2005.

Bijal V. Vakil, David L. Larson, Terrence Patrick McMahon, William G. Gaede, III, Palo Alto, CA, Donna M. Tanguay, John R. Fuisz, Melvin White, Stephen K. Shahida, Washington, DC, for Plaintiff.

Ann M. Mace, Carrie W. Cotter, David T. Pritikin, Hugh A. Abrams, Chicago, IL, Matthew T. Powers, San Francisco, CA, for Defendant.

## ORDER RE CROSS–MOTIONS FOR SUMMARY JUDGMENT; ORDER DENYING DR. WHITE'S MOTION TO STRIKE; ORDER IMPOSING SANCTIONS FOR VIOLATING RULE 15

WHITE, District Judge.

Presently before the Court are cross motions for summary judgment on the issue of ownership of U.S. Patent Nos. 6,582,458 (the " '458 Patent") and 6,613,073 (the " '073 Patent") (collectively, the "patents in suit") filed by Medtronic, Inc. ("Medtronic"), Los Angeles Biomedical Research Institute ("LA Biomed"), formerly known as the Research and Education Institute at Harbor–UCLA Medical Center, and Dr. Geoffrey White. Having considered the parties' papers, relevant legal authority, and having had the benefit of oral argument, the Court HEREBY DENIES Medtronic's motion for partial summary judgment, DENIES LA Biomed's motion for partial summary judgment, and GRANTS IN PART and DENIES IN PART Dr. White's motion for partial summary judgment.

## I. PROCEDURAL HISTORY

On August 15, 2003, Edwards Lifesciences LLC Research initiated a patent infringement lawsuit (the "*Edwards* patent litigation") against Medtronic, Inc. and Cook Incorporated ("Cook"). In that case, Edwards alleges that defendants are in-

fringing the patents in suit. On March 17, 2004, Medtronic moved to dismiss on the grounds that Edwards did not have standing to sue because one of the two inventors of the patents in suit, Dr. White, was contractually obligated to assign his ownership interest in the patents in suit to Medtronic and/or LA Biomed.[1] On June 14, 2004, Medtronic initiated the instant breach of contract action against Dr. White. LA Biomed subsequently intervened in the case by stipulation of the parties and asserted its own breach of contract claims against Dr. White.[2] Following the hearing on Medtronic's motion to dismiss, the Court stayed the *Edwards* patent litigation pending resolution of the ownership issue of the patents in suit. (*See* Order dated November 1, 2004.) The Court ordered limited discovery and scheduled a hearing on cross-motions for summary judgment related solely to resolution of the ownership issue.[3]

## II. FACTUAL BACKGROUND

The following facts are undisputed except where otherwise indicated. Dr. White is an experienced vascular surgeon that began his training in the 1980s. (Declaration of Dr. White dated July 20, 2004 ("White 2004 Decl.") at ¶¶ 3, 4.) Between 1985 and 1989, Dr. White was Chief of Vascular Surgery at the Veteran's Administration Medical Center and was on staff at Harbor/UCLA Medical Center. (*Id.*, ¶ 4.) As part of his employment with LA Biomed, Dr. White signed a "Patent and Copyright Agreement" with LA Biomed

(the "LA Biomed Agreement") in 1985, which obligated him to assign to LA Biomed any patentable device that is "conceive[d], and/or reduce[d] to practice while employed by LA Biomed or using its research facilities." (*Id.*, Ex. 7, ¶ 4.)

On or about July 21, 1989, Dr. White entered into a consulting agreement with Medtronic (the "Medtronic Agreement"). (Declaration of Bijal V. Vakil in support of Medtronic's Motion for Summary Judgment ("Vikal Decl."), Ex. 3.) By this agreement, Dr. White agreed to "serve as an advisor to Medtronic regarding Medtronic's vascular graft product performance in Australia." (*Id.*) As part of this work, the parties agree that Dr. White was asked to contact a surgeon in Australia, Dr. Grosser, to discuss his use of the Medtronic vascular graft.

Under Section IV entitled "Inventions/Assignment," the Medtronic Agreement states that:

> During the term of this Agreement it is contemplated that you will generate ideas, inventions, improvements, suggestions or copyrightable materials. These will fall into one of two categories: (A) Ideas, inventions, improvements, suggestions or copyrightable material *derived directly* from your consultation under this Agreement; (B) Ideas, inventions, improvements, suggestions or copyrightable material *not derived directly* from your consultation under this Agreement.

(*Id.* (emphasis added).) Under this agreement, Dr. White agreed "to disclose and

---

1. Throughout this order the Court refers to REI by is current name, LA Biomed.

2. By order dated June 9, 2004, the Court related the *Edwards* patent litigation to *Medtronic, Inc., et al. v. White.*

3. The parties dispute whether ownership of U.S. Patent No. 5,782,904 (the " '904 patent") is properly part of the motions for summary

judgment. While Medtronic's breach of contract case against Dr. White involves the '458, the '073, and the '904 patent, the *Edwards* patent litigation only involves the patents in suit. The Court's order specifically limited these summary judgment motions to ownership of the patents in suit, and the Court did not state or intend to state that these motions for partial summary judgment would include the '904 patent.

assign to Medtronic in a form satisfactory to its Chief Patent Counsel any idea, invention, improvement, suggestion or copyrightable material" that was derived directly from his consultation under the Medtronic Agreement. (*Id.*) The assignment provision does not, however, apply to ideas, etc. not derived directly under the Medtronic Agreement. For ideas not derived directly, the Medtronic Agreement states that "[f]or your protection, you agree that you will not disclose ideas, inventions, improvements, suggestions or copyrightable material as defined in IV.B. unless you have determined that you wish to assert no proprietary interest or you have established a separate written agreement with Medtronic." (*Id.*)

Under a section entitled "Confidentiality," the Medtronic Agreement states that "[a]ny information, data, devices, and results of study developed in the course of providing your consulting services are or shall be the property of Medtronic and shall be maintained in confidence and not used by you for profit without written consent of Medtronic or until the expiration of two (2) years from the date of expiration or cancellation of this Agreement." (Vikal Decl., Ex. 3.)

The term of the Medtronic Agreement was for one year beginning on August 1, 1989 and is governed by the laws of Minnesota.[4] (*Id.*) Dr. White returned to conduct research in Australia in August 1989 and came back to the United States in December 1992 and January 1993 to conduct research at LA Biomed's facilities. The parties dispute what work Dr. White actually performed and what information he actually reviewed under the Medtronic Agreement.

On September 30, 1993, Dr. White and the co-inventor of the patents in suit, Dr. Yu, filed a patent application in Australia for "intraluminal grafts." This graft, which the Court refers to as the GAD-graft device, is a vascular graft that is designed to treat aneurysms or occlusive diseases. (Mace Decl., Exs. 1, 2.) Unlike other grafts, the GAD-graft device is not sewn directly into the vessel during an open procedure, but is rather delivered to a damaged vessel "intraluminally," via catheter. (*Id.*) Instead of having a separate stent sewn to the top of the graft material, the GAD-graft device uses wireforms interwoven into the graft material along its length in order to circumferentially support the graft material. (*Id.*) In 2000, Dr. White filed a patent application for the GAD-graft devices under the Patent Cooperation Treaty ("PCT") for what would later become the '458 and '073 Patents. Both Medtronic and LA Biomed now claim an ownership right in the patents in suit by virtue of Dr. White's previous work in 1989 and 1992–93, respectively.

Resolution of Medtronic and LA Biomed's claims against Dr. White turns on determining when and where Dr. White developed and eventually reduced to practice the inventions that later became the patents in suit. Medtronic asserts that Dr. White generated his ideas for the patents in suit while he was working as a consultant for Medtronic in 1989. Dr. White argues that he developed and reduced to practice his inventions in Australia between 1991 and 1993. LA Biomed contends that Dr. White actually reduced to practice the patents in suit in December

---

4.  Dr. White argued in his summary judgment motion that Medtronic terminated the Medtronic Agreement shortly after it commenced. (White Mot., p. 18.) At the hearing, however, counsel for Dr. White conceded that termi-

nation of the Medtronic Agreement required sixty days' written notice, and that there was no evidence in the record that either Medtronic or Dr. White provided such notice.

1992 and January 1993 when he and Dr. Yu, conducted a series of tests at LA Biomed's research facilities.[5]

## III. ANALYSIS

### A. Legal Standard.

A principal purpose of the summary judgment procedure is to identify and dispose of factually unsupported claims. *Celotex Corp. v. Catrett,* 477 U.S. 317, 323–24, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). Summary judgment is proper when the "pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed. R.Civ.P. 56(c). An issue is "genuine" only if there is sufficient evidence for a reasonable fact finder to find for the non-moving party. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248–49, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). A fact is "material" if the fact may affect the outcome of the case. *Id.* at 248, 106 S.Ct. 2505. "In considering a motion for summary judgment, the court may not weigh the evidence or make credibility determinations, and is required to draw all inferences in a light most favorable to the non-moving party." *Freeman v. Arpaio,* 125 F.3d 732, 735 (9th Cir.1997).

A party moving for summary judgment who does not have the ultimate burden of persuasion at trial, must produce evidence which either negates an essential element of the non-moving party's claims or show that the non-moving party does not have enough evidence of an essential element to carry its ultimate burden of persuasion at trial. *Nissan Fire & Marine Ins. Co. v. Fritz Cos.,* 210 F.3d 1099, 1102 (9th Cir. 2000).

Once the moving party meets this initial burden, the non-moving party must go beyond the pleadings and by its own evidence "set forth specific facts showing that there is a genuine issue for trial." Fed. R.Civ.P. 56(e). The non-moving party must "identify with reasonable particularity the evidence that precludes summary judgment." *Keenan v. Allan,* 91 F.3d 1275, 1279 (9th Cir.1996) (*quoting Richards v. Combined Ins. Co.,* 55 F.3d 247, 251 (7th Cir.1995)) (stating that it is not a district court's task to "scour the record in search of a genuine issue of triable fact"). If the non-moving party fails to make this showing, the moving party is entitled to judgment as a matter of law. *Celotex,* 477 U.S. at 323, 106 S.Ct. 2548.

### B. The Medtronic Agreement

Medtronic's ownership interest, if any, in the patents in suit depends upon a showing that Dr. White derived his "[i]deas, inventions, improvements, suggestions or copyrightable material" *directly* from his consultation.[6] (Vikal Decl., Ex. 3 (Medtronic Agreement, Section IV).) Pri-

---

**5.** Medtronic and LA Biomed have entered into an agreement, the terms of which are confidential, whereby LA Biomed has agreed to transfer any rights it obtains in the patents in suit to Medtronic in return for Medtronic's agreement to reimburse LA Biomed for its attorneys's fees incurred in connection with this lawsuit. Pursuant to this Agreement, Medtronic also has the right to approve of the language included in any filings in this case by LA Biomed.

**6.** It is immaterial for purposes of these motions, which are limited to resolving the issue

of ownership of the patents in suit, whether Dr. White breached Section IV.B of the Medtronic Agreement That section relates to Dr. White's obligation not to disclose ideas, etc. that are not derived directly from his work under the Medtronic Agreement, unless Dr. White has determined that he wishes to assert "no proprietary interest or [he has] established a separate written agreement with Medtronic." (Vikal Decl., Ex. 3.) A breach of this section would not result in assignment of the ownership of the patents in suit, but would more likely result in contract damages.

or to evaluating the evidence, it is necessary to define the scope of Dr. White's duties under the Medtronic Agreement. Section I of the Medtronic Agreement states that "[y]ou will serve as an advisor to Medtronic regarding Medtronic's vascular graft product performance in Australia." (*Id.*) The contract contains an integration clause that states that "[t]his Agreement represents the only Agreement relating to this subject matter between you and Medtronic." (*Id.*)

Medtronic argues that Dr. White's duties under the Medtronic Agreement should be interpreted broadly to obligate Dr. White to act generally as a "vascular graft consultant," a "graft advisor," or as a "consultant for 'Medtronic's vascular graft product' in Australia." (Medtronic's Mot., pp. 1, 4, 18, 21.). This interpretation is based, in part, on a July 17, 1989 letter sent to Dr. White that purports to describe in greater detail the work Medtronic contemplated Dr. White would perform under the Medtronic Agreement. (Vikal Decl., Ex. 4.)

Consideration of extrinsic evidence such as the July 17, 1989 letter is inappropriate when the contract is integrated and the terms are not ambiguous. Here, neither party argues that the contract is ambiguous, and therefore, the Court declines to consider the July 17, 1989 letter or any other parol evidence to interpret the terms of the Medtronic Agreement. *Alpha Real Estate Co. of Rochester v. Delta Dental Plan of Minn.*, 664 N.W.2d 303, 312 (Minn. 2003) (stating that parol evidence is inadmissible to vary, contradict, or alter the written agreement). Based on the foregoing, the Court interprets the contract to obligate Dr. White to evaluate Medtronic's vascular graft product performance in Australia only.[7]

### 1. Term of Assignment Provision in Medtronic Agreement

The Medtronic Agreement's Assignment provision states that "[d]uring the term of this Agreement..." Dr. White agreed to assign ideas, etc. that he derived directly from his consulting work. (Vikal Decl., Ex. 3 (Section IV).) The term of the Medtronic Agreement was for a period of one year beginning on August 1, 1989. (*Id.* (Section V).) Under a separate section entitled Confidentiality, Dr. White agreed to "keep confidential and not use for profit without written consent from Medtronic or until the expiration of two (2) years from the date of expiration or cancellation of this

---

7. Grafts like the GAD-graft device are deployed to the damaged vessel via catheter, whereas vascular grafts are directly sewn into the vessel during an open procedure. Medtronic argues that the term "vascular graft" used in the Medtronic Agreement included both vascular and endovascular grafts. (Medtronic Mot., p. 9.) Under Medtronic's theory, Dr. White derived the ideas, etc. for the patents in suit while he was working for Medtronic because Dr. White's consultation under the Medtronic Agreement encompassed endovascular grafts, and the patents in suit relate to endovascular grafts.

Resolution of whether the use of the term "vascular grafts" in the Medtronic Agreement included endovascular grafts is not a material issue here. It is undisputed that the vascular graft that was the subject of the materials purportedly reviewed by Dr. White related to a vascular graft sewn directly into a blood vessel. It is also undisputed that the patents in suit relate to a graft that is deployed intraluminally and, thus, not sewn into the vessel. (Mace Decl., Exs. 1, 2.) Despite these differences, the evidence also shows that vascular grafts and endovascular grafts can share some common problems, such as slipping, kinking, and twisting of the grafts. (*Id.*; Vikal Decl., Ex. 7 (Dilley Report).) Therefore, regardless of whether the term vascular graft did or did not include endovascular grafts, Medtronic is not foreclosed from arguing that Dr. White could have derived the ideas for his patents in suit directly from his consulting work related to only vascular, i.e., not endovascular, grafts.

Agreement, any information, data, devices and results of study developed in the course of providing your consulting services." (*Id.* (Section III).) Contrary to arguments made by Medtronic's counsel at the hearing, the two year "tail" specifically refers to disclosure or use of Medtronic's confidential information, but not to the assignment provision. Based on the foregoing, the Court interprets the assignment period to cover only the time period between August 1, 1989 and July 31, 1990.

### 2. Problems Identified in the Dilley Report and Jackie Eastwood's Reports With Medtronic's Vascular Graft.

■ The Court now turns to evaluating Medtronic's argument that Dr. White derived the patents in suit directly from his consulting agreement. First, Medtronic contends that Dr. White was able to derive directly the ideas, etc. for the patents in suit directly from two documents that were sent to him that purportedly contained information relating to Medtronic's vascular graft product performance in Australia. The first of these documents is a copy of what has been termed the "Dilley Report," which is an evaluation of Medtronic's vascular graft called the "Atrium" prepared by Dr. Dilley dated June 8, 1989. (Vikal Decl., Exs. 7, 8.) The second document is a letter from Jackie Eastwood at Medtronic explaining problems with Medtronic's graft.[8] (*Id.*)

Medtronic argues that these documents identify five specific problems with Medtronic's vascular graft. (Medtronic Mot., p. 22.) These problems include (1) graft

cutting for fitting into vessels, (2) separation of graft ring material from fabric, (3) kinking of the graft, (4) extension/longitudinal movement of graft, and (5) graft handling and insertions into tissue. (*Id.*) Medtronic contends that the patents in suit "solve the very same problems that Dr. White had been asked to address for Medtronic," and hence, were derived directly from his work under the Medtronic Agreement. (Medtronic Mot., p. 22.)

### (a) Problems Associated With "Graft Cutting for Fitting into Vessels"

The first problem relates to issues with "graft cutting for fitting into vessels." In his report, Dr. Dilley notes that while the Medtronic graft had been touted as being easier to handle than other graft materials, the ease in handling "is basically obliterated when you have to cut the graft with cautery. It makes the rim of the fabric stiff and a little difficult to sew...." (Vikal Decl., Ex. 8.) Jackie Eastwood reports that "the 'beading' [or clumping of the graft material] is a result of using the cautery at a low temperature and cutting slowly." (Vikal Decl., Ex. 9.) Medtronic argues that two specific passages in the patents in suit purportedly address this problem and is therefore evidence that Dr. White derived the patents in suit directly from his work with Medtronic.

Dr. White argues that the first section cited by Medtronic in the '458 patent at 1:32–43 and the '079 patent at 1:37–48 does not even mention problems associated with cutting grafts described above, and that this language therefore fails to show a disputed issue of fact.[9] The second pas-

---

**8.** According to Medtronic, a third document was attached to Ms. Eastwood's July 17, 1989 letter that contained Medtronic's confidential due diligence report of the Atrium Medical Corporation. (Vikal Decl., Ex. 4.) Medtronic makes no arguments here linking whatever information was contained in this report to

the patents in suit, and thus is not relevant to these motions.

**9.** The section referred to by Medtronic states in full that "[t]here are a number of problems associated with [stents and intraluminal grafts]. These include the problem of twist-

sage relied upon by Medtronic states that "[w]hile the graft will normally have wires at each end of the graft with their crests extending beyond the graft body, it may be necessary or desirable for a surgeon to shorten a graft and this may be achieved by cutting off part of the graft body." ('458 Patent at 1:32–43, 1:67–2:5; '073 Patent 1:37–48, 2:7–11.) As with the previous section, Dr. White contends that this language refers to properly measuring grafts, and not to the problem identified above that relates to cutting or sewing grafts.

The Court agrees. The undisputed evidence shows that endoluminal placement of the grafts like the GAD-graft device does not involve cutting and sewing the graft into place. (Mace Ex. 22) (Mirich et al., "Percutaneously Placed Endovascular Grafts for Aortic Aneurysms: Feasibility Study," *Radiology*, March 1989, p. 1036); Mace Ex. 8 (Laborde, "Intraluminal Bypass of Abdominal Aortic Aneurysm: Feasibility Study," *Radiology*, 1992 ("Laborde article"); Mace Ex. 26 (Chapter 26, entitled "Vascular Stents," by Drs. White and Yu in *Vascular Surgery Principles and Practice*, edited by Veith, Hobson, Williams, and Wilson, 1994).) The language above that actually does mention cutting does not involve problems associated with graft cutting, or provide an improved way of cutting grafts to avoid the problems identified by Dr. Dilley. Based on the foregoing, this evidence is insufficient to show that Medtronic is entitled to judgment as a matter of law that Dr. White derived the patents in suit directly from evaluating this problem. This evidence also demonstrates that Medtronic does not have sufficient evidence to carry its ultimate burden of persuasion at trial.

With respect to this issue, therefore, Medtronic's motion is DENIED and Dr. White's motion is GRANTED.

### (b) Problems Relating to Separation of the Graft Ring From the Fabric

The second problem identified with Medtronic's vascular graft relates to issues with the graft ring separating from the fabric. (Vikal Decl., Ex. 8.) Dr. Dilley's report states that the "ring material tends to separate from the fabric itself once you get the graft wet." (*Id.*) Medtronic argues that this problem is addressed in the patents in suit where it recognizes the problem of "avoidance of inadvertent separation of a supporting *stent* and the covering sleeve." ('458 Patent at 1:32–43; '073 Patent 1:37–48 (emphasis added).) Dr. White contends that this evidence does not create a material issue of fact because separation of the stent from the graft is different from the separation of the ring structure from the graft material. (White's Opp., p. 9.)

The Court agrees with Dr. White. The evidence demonstrates that Medtronic's vascular graft has a supporting ring structure woven into the graft fabric. (Vikal Decl., Ex. 19) The graft fabric is wrapped around a stent and, as described in the article authored by Drs. White, Yu, and May, "Stented and Non–Stented Endoluminal Grafts for Aneurysmal Disease: The Australian Experience" (the "Australian experience article"), secured to the vessel with "sutures or gluing." (Mace Decl., Ex. 13.) The problem identified by Dr. Dilley relates to separation of the ring structure from the graft material, whereas the problem identified by the patents in suit relates

---

ing or kinking of the graft when it has to extend along a non-linear path, which twisting or kinking can lead to occlusion of the lumen of the graft; lack of precise control of the expansion of the graft in the lumen;

avoidance of inadvertent separation of a supporting stent and the covering sleeve; and maintaining the graft against longitudinal movement along the lumen in which it is placed." (Mace Decl., Exs. 1, 2.)

to separation of the graft material from the stent. Based on the fact that the evidence shows that the problem identified in the patents in suit is different from the problem identified by Dr. Dilley, Medtronic fails to show that it is entitled to judgment as a matter of law that Dr. White derived the patents in suit directly from evaluating this problem. This evidence also demonstrates that Medtronic does not have sufficient evidence to carry its ultimate burden of proof at trial. With respect to this issue, therefore, Medtronic's motion is DENIED and Dr. White's motion is GRANTED.

Also related to this issue is Medtronic's unsubstantiated contention that "[t]hrough his work under the [Medtronic Agreement], Dr. White was exposed to the concept of a ring support structure." (Medtronic Mot., p. 10.) The undisputed evidence shows, however, that prior to even entering into the Medtronic Agreement and while he was employed by UCLA–Harbor, Dr. White had used "grafts that had a ring structure both built into the wall of the graft and around the graft." (Mace Decl., Ex. 30 (White Depo. 46:5–7).) Articles included in the record describing tests of endovascular grafts also demonstrate that the concept of a ring structure, similar to both Medtronic and Dr. White's vascular grafts, was not new in the field of vascular surgery when Dr. White entered into the Medtronic Agreement. For example, an article published by the American Journal of Surgery in August 1989 discussed tests completed by one researcher, Dr. Oz, in 1980–1982 involving "a sutureless intraluminal prosthesis in the abdominal aorta" and updates his experience with "sutureless intraluminal *ringed* prosthesis in the abdominal aorta and review technical considerations pertaining to insertion of the graft and the construction of composite grafts..." (Mace Decl., Ex. 31 (emphasis added).) Likewise, the article entitled

"Percutaneously Placed Endovascular Grafts for Aortic Aneurysms: Feasibility Study" published in *Radiology* in 1989 tests an endovascular graft using "wire bent into a six-tip zig-zag configuration..." (Mace Decl., Ex. 22.) Medtronic's unsubstantiated claim that Dr. White derived the ring design for the patents in suit directly from his consulting work fails to demonstrate that it is entitled to judgment as a matter of law with respect to this issue. This evidence also demonstrates that Medtronic does not have sufficient evidence to carry its ultimate burden of proof at trial. With respect to this issue, therefore, Medtronic's motion is DENIED and Dr. White's motion is GRANTED.

**(c) Problems Relating to Kinking and Twisting of the Graft Material, and Extension/Longitudinal movement of the Graft.**

The third and fourth problems relate to issues that arise with ensuring that the vascular graft remains in position after it is implanted. One problem relates to "kinking of the graft." (Medtronic Mot., p. 22.) Specifically, Dr. Dilley noted that "I think you have to put quite a bit more tension on the prosthesis than surgeons are use [sic] to doing in order to avoid redundancy and *subsequent kinking.*" (*Id.* (emphasis added).) Dr. Anderson's report attached to Jackie Eastwood's letter suggests that the problem of kinking and twisting is caused, in part, by difficulties in suturing the graft to the vessel wall. The fourth problem relates to "extension/longitudinal movement of the graft." (*Id.*) Dr. Dilley reports that "the graft is extremely elastic in the longitudinal access. This makes it quite difficult to get the length just right."

To support its contention that Dr. White derived the patents in suit directly, Med-

tronic points to language in the patents in suit stating recognizing the problem of "twisting or kinking of the graft when it has to extend along a non-linear path, which twisting or kinking can lead to occlusion of the lumen of the graft." ('458 Patent at 1:32–43; '073 Patent 1:37–48.) Medtronic also argues that the fourth problem is addressed in the patents in suit where it recognizes the problem of "lack of precise control of the expansion of the graft in the lumen." ('458 Patent at 1:32–43; '073 Patent 1:37–48.)

Having reviewed the evidence submitted by both Dr. White and Medtronic, the Court finds that genuine issues of material fact exist over whether Dr. White derived directly from his work with Medtronic the ideas expressed in the patents in suit that relate to kinking, twisting, and longitudinal movement of a graft. Unlike the previous problems identified in the Dilley Report and Ms. Eastwood's letter, the problems relating to "kinking, twisting, and longitudinal movement" appear to be addressed by the patents in suit, albeit in connection with endovascular grafts rather than vascular grafts. In light of various statements in the record by Dr. White that he began to develop the endovascular graft design that ultimately became the patents in suit in 1989, that there is no genuine issue of material fact that Dr. White did not derive, at the very least, his ideas for the patents in suit from his evaluation of these problems. (Vakil Decl., Ex. 14, ¶ 7; Vikal Decl. Ex. 1 (Dr. White's July 20, 2004 Declaration); Vikal Decl., Ex. 15, p. 108 (Australian Experience article).) Based on the foregoing, the Court concludes that genuine issues of material fact exist over whether Dr. White was able to derive the ideas, etc. for the patents in suit directly from the problems identified in the Dilley report and Ms. Eastwood's letter relating to kinking, twisting, and longitudinal movement of the graft.

**(d) Problems Associated with Graft Handling and Insertions Into Tissue**

This problem appears to be closely related to the first problem, which focused on difficulty in cutting the graft and inserting or fitting it into vessels. Medtronic argues that language in the patents in suit stating that "the invention relates to a method for positioning an intraluminal graft ... comprising introducing a catheter into a vein, ..." supports its claim that Dr. White derived directly the patents in suit. (Mace Decl., Ex. 2 ('073 patent 1:60–62; '458 patent 1:54–63).) Just as with the first problem, the evidence proffered by Medtronic shows that the problem of "graft handling and insertions into tissue" identified in Dr. Dilley's report is associated with the cutting and suturing aspect of implantation of the Medtronic vascular graft. The endovascular graft, however, is implanted by way of catheter and does not involve suturing. As with the Court's discussion of the first problem, this evidence is insufficient to show that Medtronic is entitled to judgment as a matter of law that Dr. White derived the patents in suit directly from evaluating this problem in connection with his work under the Medtronic Agreement. This evidence also demonstrates that Medtronic does not have sufficient evidence to carry its ultimate burden of proof at trial. With respect to this issue, therefore, Medtronic's motion is DENIED and Dr. White's motion is GRANTED.

For the foregoing reasons, Dr. White's motion for partial summary judgment is GRANTED with respect to problems one, two, and five discussed above. Due to the existence of genuine issues of material fact relating to problems three and four, Dr. White's motion for partial summary judgment with respect to these problems is

DENIED and Medtronic's motion for partial summary judgment is DENIED.

## C. The LA Biomed Agreement

LA Biomed bases its ownership claims to the patents in suit on research that Dr. White performed at LA Biomed's facilities in December 1992 and January 1993. LA Biomed contends that this research constituted "reduction to practice" under the LA Biomed Agreement.[10] Dr. White disputes this argument and claims that reduction to practice occurred in Australia prior to his research at LA Biomed.

### 1. Reduction to Practice Defined

■ Reduction to practice is a question of law that is based on subsidiary factual findings. *Hybritech Inc. v. Monoclonal Antibodies, Inc.*, 802 F.2d 1367, 1376 (Fed.Cir.1986). To satisfy its burden to show reduction to practice while Dr. White was conducting research at LA Biomed, LA Biomed must demonstrate that (1) Dr. White constructed an embodiment or performed a process that met all the limitations of the claimed invention, and (2) he determined that the invention would work for its intended purpose. *Cooper v. Goldfarb*, 154 F.3d 1321, 1327 (Fed. Cir.1998) (citations omitted). "In order to corroborate a reduction to practice, it is not necessary to produce an actual over-the-shoulder observer. Rather, sufficient circumstantial evidence of an independent nature can satisfy the corroboration requirement." *Id.citing Knorr v. Pearson*, 671 F.2d 1368, 1373 (Cust. & Pat.App. 1982).

■ LA Biomed argues that "reduction to practice" cannot occur outside of the United States, citing 35 U.S.C. § 104 (Gaede Decl., Ex. 12, Section 104 (pre–1993 amendment).) This statutory provision relates to patent interference proceedings, and specifically prohibits a patent applicant from relying on activities that constitute reduction to practice outside of the United States to establish an earlier invention date. There is nothing in the LA Biomed Agreement that mentions § 104, or states that a "reduction to practice" means a reduction to practice in the United States. None of the authority on which LA Biomed relies involves application of section 104 in a breach of contract case to limit reduction to practice to the United States, but rather involves patent interference proceedings. Based on the foregoing, the Court interprets the term "reduction to practice" as not limited to activities in the United States.

### 2. Genuine Issues of Material Fact Exist Over Whether Some, But Not All, of the Testing at LA Biomedical Constitutes Reduction to Practice.

■ LA Biomed contends that the testing performed by Dr. White at its facilities constituted reduction to practice sufficient to give rise to ownership rights in the patents in suit under the LA Biomed Agreement. It is undisputed that these tests included (1) overlapping two GAD devices and then conducting pull-apart testing, inspection of the interior of the vessel using an endoscope, visu-

---

**10.** It is undisputed that LA Biomed's ownership claims, if any, flow from language in the LA Biomed Agreement stating that Dr. White is obligated to disclose and assign to LA Biomed inventions that are either conceived or reduced to practice while using LA Biomed's facilities. (Mace Decl., Ex. 4.) Here, the parties do not appear to dispute

that Dr. White did not conceive of his idea for the patents in suit while at LA Biomed in 1992 and 1993. Therefore, the Court's discussion regarding LA Biomed's ownership claims focuses on whether Dr. White reduced to practice the patents in suit at LA Biomed, and not when he conceived of the ideas for the patents in suit.

al inspection, inspection with an intravascular ultrasound probe, calibration and measurement of the thickness of the graft materials, and effect of expansion of balloons during deployment of intraluminal grafts (collectively, the "bench top testing"); and, (2) intraluminally placing a unibody GAD-graft attachment device into six mongrel dogs.[11] (White's 1/11/05 Depo., p. 339; Gaede Decl., Ex. 10.; Dr. Yu's Depo., p. 76.) Dr. White argues that the foregoing testing did not constitute reduction to practice because the bench top testing had been successfully tested in Australia prior to coming to LA Biomed. Dr. White also claims that the canine testing cannot constitute reduction to practice because it did not involve overlapping GAD-graft devices, an essential claim of the patents in suit.

### (a) Genuine Issues of Material Fact Exist Over Whether Bench Top Testing Constituted Reduction to Practice at LA Biomed.

LA Biomed bases its argument that the bench top testing constituted reduction to practice at LA Biomed on Dr. White's declaration submitted to the PTO in 2000 stating that while at LA Biomed he tested "[m]ore than twenty grafts [ ] and the bench tests indicated that one graft could be supported within another."[12] (Gaede Decl., Ex. 8, ¶ 9.) Dr. White argues that the bench top testing involving overlapping GAD-graft devices did not constitute reduction to practice at LA Biomed because the evidence demonstrates that Dr. White performed these tests in Sydney prior to coming to the United States. (Mace Decl., Ex. 9 (White Depo., 261:16–25; 284:3–285:9).) Specifically, Dr. White relies on a diary entry made by Dr. Yu in Australia on July 3, 1992 that he claims reflects a reduction to practice of overlapping GAD-grafts. (White Mot., p. 7–8; Yu Decl., Ex. C.) This diary entry states: "[s]equential inflation of GAD + graft was done in GW and Charles Fischer's presence." (*Id.*) Dr. Yu states in his declaration that "[t]his diary entry confirms that a graft was inflated and then a GAD inflated inside the graft." (Yu Decl., ¶ 5.) At his deposition, Dr. Yu identified this entry as relating to the overlapping of two GAD-graft devices. (Mace Decl., Ex. 11 (Yu (2005) Depo. 88:24–89:2).)

To refute Dr. White's evidence of reduction to practice in Australia, LA Biomed contends that the "GAD + graft" diary en-

---

11. While Dr. White was in the United States in December 1992 and January 1993, he also performed tests at VA–Long Beach under Dr. Gordon. At VA–Long Beach, Dr. White performed turbulence tests to examine how much turbulence flow there was when he overlapped the grafts. According to Dr. White, he knew the turbulence test was successful because the test had been "tested and trialed [ ] before" in Sydney. (*Id.* at 285:21–25.)

12. Contrary to LA Biomed's contentions, Dr. White's claim here that he reduced to practice the patents in suit in Australia prior to coming to the United States is not necessarily inconsistent with his declaration to the PTO in 2000 stating that "in December of 1992 I undertook bench testing of an endovascular graft having features disclosed in the [patent applications for the '458 and '079 patents]. This bench testing occurred at [LA Biomed]. The bench testing included placing an endovascular graft inside another graft and balloon expanding the endovascular graft therein.... More than twenty grafts were tested and the bench tests indicated that one graft could be supported within another." As LA Biomedical points out, between 1985 and 1993, the patent interference statute required a foreign inventor to demonstrate conception and reduction to practice in the United States in order to obtain an invention date that predated the filing of his/her first patent application. 35 U.S.C. § 104 (1993). While Dr. White's declaration relates to reduction to practice in the United States, it does not foreclose the possibility that he first reduced to practice the patents in suit in Australia prior to coming to LA Biomed.

try does not necessarily reflect a reduction to practice because Dr. White previously used the term GAD to reference a "graft attachment device" in his deposition testimony, and that the "GAD + graft" language therefore relates to "a metallic wiry structure and a graft [and] not [to] two things that White now calls GAD grafts or to the overlapping of such grafts." (LA Biomed Opp., p. 9) (citing Mace Decl., Ex. 9 (White's 2005 Depo., 247–48, 250–52).) The ambiguity regarding this diary entry is further demonstrated by Dr. Yu's deposition testimony in 2004 where, after reviewing the same diary entries, Dr. Yu testified that "I think I can state I don't see any specific device of a GAD graft overlapping into another GAD graft in this document." (Mace Decl., Ex. 12 (Yu 2004 Depo., 179:19–22).)

Notwithstanding this inconsistent testimony, Dr. White argues that the Australian Experience article stating that "we also found that GAD-grafts could be overlapped" corroborates his argument that "GAD + graft" means overlapping GAD-graft devices. This article, which was published in 1995, does not state where or when this test was conducted. (Mace Decl., Ex. 13.) Likewise, Dr. White's reliance on the *Angiology* article is not helpful because it does not discuss overlapping GAD-graft devices. (*Id.*, Ex. 14.) Dr. White's reliance on the testimony of Dr. James May, who worked with Drs. White and Yu, also fails to eliminate the disputed issues of fact because his conclusion that

GAD-graft devices were overlapped and tested in Australia prior to coming to LA Biomed is based on the Australian Experience and Angiology articles. As previously stated, these articles do not resolve the disputed issues of fact relating to whether Dr. White conducted tests of overlapping GAD-graft devices in Australia in July 1992.[13]

Based on the foregoing, the Court concludes that genuine issues of material fact exist over whether the bench top testing at LA Biomed constituted reduction to practice. Dr. White and LA Biomed's motions for partial summary judgment on this issue are therefore each DENIED.

**(b) There are No Genuine Issues of Material Fact that the Canine Testing Did Not Constitute Reduction to Practice.**

Dr. White and LA Biomed dispute whether the canine studies conducted by Dr. White at LA Biomed constituted reduction to practice. It is undisputed that these tests involved endoluminal placement of a *unibody* GAD-graft attachment device, and not overlapped grafts. (Mace Decl., Ex. 9 (White 2005 Depo., pp. 329–30).) Also undisputed by the parties is that the patents in suit all involve overlapped devices. (LA Biomed Mot., p. 2 (stating that the patents in suit "claim subject matter that at a minimum, require *overlapping* of two intraluminal grafts") (em-

**13.** To refute Dr. White's argument that "GAD + graft" means testing of overlapping GAD-grafts, LA Biomedical also argues that an earlier entry on the same day stating that "[s]uccessful deployment of GAD in vitro" suggests that the "GAD + graft" entry "likely means that a woven Dacron graft was combined in some way with a wire structure. But it is not clear how." (LA Biomed Opp., p. 8–9.) LA Biomed also argues that the absence of any language stating that the grafts were "overlapped" further supports its argument that "GAD + graft" doesn't mean overlapping GAD-grafts. (*Id.*) According to LA Biomed, the use of the term "sequential" does not mean that the GAD-grafts were overlapped, but rather means that Dr. Yu sequentially inflated different sized balloons. (*Id.*) LA Biomed's interpretation of Dr. Yu's diary entry, however, is unsupported by evidence in the record, and therefore is insufficient to refute Dr. White's claim that this entry reflected a successful test of overlapping GAD-graft devices.

phasis in original); '073 Patent at C. 6, 1.43; '458 Patent C. 6,1.11.)

Evidence submitted by LA Biomed fails to show that LA Biomed is entitled to judgment as a matter of law that the canine testing constituted reduction to practice at LA Biomed. LA Biomed points to a statement in the *Vascular Surgery* article that "[e]ndoluminal placement of ... graft-stent devices is feasible as *demonstrated in this canine model*" to support its argument that reduction to practice occurred at LA Biomed. The feasibility of endoluminal placement of a GAD-graft device, however, is only one component of what the patents in suit address and does not address the feasibility of overlapping these devices and delivering them intraluminally to the damaged vessel. (*Id.*, Ex. 18 (*Vascular Surgery* article, p. 447) (emphasis added).) LA Biomed's reliance on a statement made by Dr. White that the canine study constituted the "ultimate flow testing" of the GAD-device does not create a genuine issue of material fact here because it is undisputed that this "ultimate flow testing" was not testing the patented technology. (Mace Decl., Ex. 9 (White 2005 Depo. 339:6–8).) If, as the parties agree, the patents in suit claim subject matter that at a minimum requires the "overlapping of two intraluminal grafts," or in other words, overlapping GAD-graft devices, the first prong of the reduction to practice test necessarily requires testing of an overlapped GAD-graft device. Elsewhere in its motion, LA Biomed highlights the necessity of testing overlapped GAD devices to show reduction to practice, and it may not take an inconsistent position with respect to the canine testing simply because it supports their argument.

Based on the foregoing, the evidence shows that LA Biomed fails to satisfy its burden on this issue. This evidence also demonstrates that LA Biomed does not have sufficient evidence to show that the canine testing constituted reduction to practice. LA Biomed's motion for summary judgment on this issue is therefore DENIED and Dr. White's motion for summary judgment on this issue is GRANTED.

## IV. DR. WHITE'S MOTION TO STRIKE MEDTRONIC'S AMENDED COMPLAINT

█ Currently pending before the Court is the motion of Dr. White to strike Medtronic's Amended Complaint filed on January 10, 2005. This motion is scheduled to be heard on Friday, May 20, 2005 at 9:00 a.m. Having reviewed Dr. White's motion and the Amended Complaint, it is HEREBY ORDERED that Dr. White's motion to strike Medtronic's Amended Complaint is DENIED and the hearing scheduled for Friday, May 20, 2005 is VACATED. Federal Rule of Civil Procedure 15(a) permits a party to amend its pleading once as a matter of right at any time before a responsive pleading is served. Once a responsive pleading has been served, however, amendment requires written consent of the adverse party or leave of the court. In accordance with the Rule 15(a)'s liberal pleading standard, leave of the court "shall be freely given when justice so requires." Fed.R.Civ.P. 15(a).

Here, Medtronic clearly and inexplicably violated the plain language of Rule 15 by filing an amended complaint without leave of court and over strenuous objection by Dr. White. When asked to explain its blatant violation of Rule 15, Medtronic was unable to provide any satisfactory response. Had Medtronic complied with Rule 15(a) by filing a properly noticed motion to amend, it is likely that under the liberal pleading standards and Ninth Circuit authority, that the motion would have been granted. Medtronic did not elect this

path, and as a result, Dr. White was forced to file a motion to strike the amended complaint.

In the interest of preserving judicial resources, and in light of Rule 15's liberal pleading standards, the Court will permit Medtronic to file its amended complaint. Dr. White is HEREBY ORDERED to file an amended answer by **Friday, May 6, 2005**. As a sanction for violating Rule 15, however, Medtronic is FURTHER ORDERED to pay Dr. White's attorneys' fees and costs incurred in filing his motion to strike. Dr. White shall submit a declaration attaching billing records supporting its claim for attorneys' fees and costs incurred in connection with his motion to strike by no later than **Friday, April 29, 2005**. The Court will issue an order regarding the attorneys' fees after it has had an opportunity to review the declaration.

## V. CONCLUSION

Based on the foregoing reasons, Dr. White's motion for partial summary judgment is GRANTED IN PART and DENIED IN PART. The motions for partial summary judgment filed by Medtronic and LA Biomed are each DENIED. Genuine issues of material fact exist as to the following issues:

(1) Whether Dr. White was able to derive directly the ideas, etc. that formed the basis for the patents in suit from the two following problems identified in the Dilley Report and by Ms. Eastwood: (a) problems associated with kinking of the graft, and (b) problems with extension/longitudinal movement of the graft;

(2) Whether the bench top testing involving overlapping GAD-graft devices constitutes reduction to practice at LA Biomed.

Because neither party moved for partial summary judgment relating to Dr. White's

affirmative defenses to each of Medtronic's and LA Biomed's claims, Dr. White's affirmative defenses as they relate to ownership of the patents in suit will also be tried on the merits. To avoid any confusion, the issues presented at trial will continue to be narrowed to ownership of the patents in suit. The parties are HEREBY ORDERED to appear for a case management conference on Friday, May 13, 2005 at 1:30 p.m. to set pretrial and trial dates.

**IT IS SO ORDERED.**